**UNITED STATES of America**

v.

**Leon Cletus "Bruno" WARD, et al.**

**No. CR192–049.**

United States District Court,
S.D. Georgia,
Augusta Division.

Sept. 15, 1992.

Thomas W. Tucker, Augusta, GA, for Leon Cletus Ward.

Richard A. Wright, and Richard Allen, for William E. Baxter.

Bernard Dunstan, Augusta, GA, for Ben Cheek.

Larry Broyles and Celeste Jones, Chicago, IL, for James T. Lester.

Ed Tolley, Athens, GA, for Christopher Nicholson.

Edward T. Garland, Atlanta, GA, for Norman A. Boulus.

Charles Sheppard, Augusta, GA, for Robert G. Dickens.

Mike Garrett, Augusta, GA, for Frank C. Tiller.

Herbert Kernaghan, Augusta, GA, for William A. Anderson.

James Purcell, Augusta, GA, and Freddie Sanders, for Nickie Marks.

Martin Puetz, Augusta, GA, for Richard F. Oglesby.

Jim Ellington, Augusta, GA, for Rufus M. Smith.

William Fletcher, Norcross, GA, for Jesse Moore.

Peter Johnson, Augusta, GA, for Michael Lamar Wallace.

Maureen Floyd, Martinez, GA, for Robert D. Wallens.

Jim Ellison, Augusta, GA, for William B. Swann.

## ORDER

BOWEN, District Judge.

Before the Court is that portion of the September 8, 1992, Magistrate's Report and Recommendation which recommended suppression of electronic wire interceptions obtained pursuant to this Court's Orders of December 21, 1990, and January 18, 1991, and suppression of evidence obtained from searches executed pursuant to warrants on January 28, 1991. Objections have been filed to that portion of the September 8, 1992, Report and Recommendation.

### I. BACKGROUND

In December 1990 and January 1991, an Assistant Attorney General of the United States authorized the United States Attorney for the Southern District of Georgia to

apply to this Court for an order under 18 U.S.C. § 2518, authorizing the interception of wire and oral communications. The Government's applications asserted that there was probable cause to believe certain named individuals, now defendants in this case, had committed and were committing certain offenses, including, *inter alia*, violations of 18 U.S.C. § 1953 and 26 U.S.C. § 7201. The Court authorized the wiretaps in reliance upon the Government's applications and supporting affidavits, and the Government executed the order. As a result of information received from the intercepts, search warrant applications were made to the Court, warrants were issued, and the searches were executed.

Violations of 18 U.S.C. § 1953 and 26 U.S.C. § 7201 are not included among the offenses listed in 18 U.S.C. § 2516 for which wiretaps may be authorized. Upon motion, the Magistrate recommended that the wiretap evidence be suppressed because the application and order of authorization included offenses which are not listed in § 2516. The Magistrate further recommended that evidence obtained from searches executed pursuant to warrants issued January 28, 1991, be suppressed because the searches were directly attributable to the illegal intercepts.

## II.  ANALYSIS

### A.  The Intercepts

The question of whether wiretap evidence should be suppressed when the applications and orders authorizing the wiretaps included within their scope offenses which are not listed in 18 U.S.C. § 2516 appears to be one of first impression.

██ Congress adopted comprehensive legislation on the subject of wiretapping and electronic surveillance by enacting Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351, 82 Stat. 212 (codified as amended at 18 U.S.C. §§ 2510–2520). Under Title III, the Government's authority to intercept wire and oral communications is an island in a sea of privacy. Title 18 U.S.C. § 2516 authorizes application and order for a wiretap when the interception might provide or has provided evidence of specific listed offenses. 18 U.S.C. § 2518 provides that the contents of any wire or oral communications intercepted pursuant to the chapter, or evidence derived therefrom, may be suppressed when the communication was "unlawfully intercepted" or the order of authorization or approval under which it was intercepted was insufficient on its face. 18 U.S.C. § 2518(10)(a). Although not every failure to fully comply with the statutory requirements of Title III renders an interception unlawful, *United States v. Chavez*, 416 U.S. 562, 574–75, 94 S.Ct. 1849, 1855–56, 40 L.Ed.2d 380 (1974), suppression is required when there is failure to comply with a statutory requirement that "directly and substantially implement[s] the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano*, 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974).

In *Giordano*, the Court held that suppression was required where the wiretap application was purportedly authorized by a specially designated Assistant Attorney General in accordance with the statutory provision for authorization, but the application was actually authorized by the Attorney General's Executive Assistant. The Court determined that Congress intended to "condition the use of intercept procedures upon the judgment of a senior official in the Department of Justice that the situation is one of those warranting their use." *Id.* at 527, 94 S.Ct. at 1832. The provision for pre-application approval "was intended to play a central role in the statutory scheme," *id.* at 528, 94 S.Ct. at 1832, and "directly and substantially" implemented Congress's limiting intentions. *See id.* at 527–28, 94 S.Ct. at 1832. Failure to meet the authorization requirement thus warranted suppression of evidence directly or indirectly obtained from the wiretap. *Id.* at 528, 533, 94 S.Ct. at 1832, 1835.

In the companion case of *Chavez*, however, the Court held that suppressing a wiretap was error where the application misidentified the authorizing official but the

proper official had actually authorized the application. Misidentification in that instance "did not affect the fulfillment of any of the reviewing or approval functions required by Congress," *id.* at 575, 94 S.Ct. at 1856, nor did the identification reporting requirements occupy a "central, or even functional, role in guarding against unwarranted use of wiretapping or electronic surveillance." *Id.* at 578, 94 S.Ct. at 1857.

■ As in *Giordano* and *Chavez*, the issue here is whether there has been, failure to satisfy a provision of Title III that "directly and substantially" implements Congress's limiting intent regarding use of wiretaps. Although the fact-pattern here differs from that in *Giordano*, the Supreme Court's examination in that case of the purpose behind Title III sheds light on the present inquiry. "[T]he purpose of the legislation ... was effectively to prohibit ... all interceptions of oral and wire communications, except those specifically provided for in the Act...." *Giordano*, 416 U.S. at 514, 94 S.Ct. at 1826. Although "[t]he Act is not as clear in some respects as it might be, ... it is at once apparent that it ... limits the crimes for which intercept authority may be obtained...." *Id.* at 515, 94 S.Ct. at 1826. Compliance with § 2516 is therefore no mere technicality; Congress took deliberate steps to restrict wiretap authorizations to a specific list of offenses. Section 2516 thus plays a "central and functional" role in furthering Congress's legislative purpose to guard against unwarranted use of wiretapping or electronic surveillance, and it "directly and substantially" implements Congress's limiting intent regarding this intrusive technique. An application cannot be sought, nor an order entered, authorizing interceptions to gather evidence of offenses not enumerated in § 2516. Those persons who were parties to the intercepted communications or against whom the interceptions were directed are entitled to suppression. 18 U.S.C. §§ 2510(11), 2518(10)(a).

Although there is authority for the proposition that offenses not listed in § 2516 may be included as part of a wiretap authorization, *In re Grand Jury Subpoena Served on Doe*, 889 F.2d 384 (2d Cir.1989), *cert. denied, Doe v. United States*, 494 U.S. 1079, 110 S.Ct. 1806, 108 L.Ed.2d 937 (1990), that decision is not binding on this Court. Furthermore, in *Doe*, the appellate court held that suppression was not warranted when the government applied for, and was granted, an *amended* order authorizing wiretaps for *crimes that could not have been the subject of wiretaps in the first instance because they were not enumerated in § 2516*. The government had shown that the *original* order had been lawfully obtained, and the communication regarding the unlisted offense which prompted the application for the amended order was *incidentally* intercepted during the course of the original lawfully executed order. *Doe* is therefore distinguishable from the present case.

The Government states in its objection to the Magistrate's Report that the intent behind including the unlisted offenses in the applications was to be candid with this Court concerning "all relevant information concerning the investigation," and that to exclude the code sections from the application "would amount to deliberately hiding the fact that § 1953 and § 7201 evidence might be intercepted." The Government is obligated to minimize interception of communications not otherwise subject to interception under Title III. 18 U.S.C. § 2518(5). Of course, evidence of *any* offense not listed in 18 U.S.C. § 2516 might be incidentally intercepted during a wiretap, and the proper procedure for pursuing intercepts regarding incidentally discovered communications concerning other offenses would be to seek, as in *Doe*, an amended order pursuant to § 2517(5). In the present case, however, the unlisted offenses were included in original applications and orders. The repeated references to 18 U.S.C. § 1953 and 26 U.S.C. § 7201 in the applications and supporting affidavits were no "mere inclusion[s] of information about other crimes the targets are committing." Clearly, the Government sought to include communications regarding these offenses as within the initial scope of the intercepts, and the orders issued in reliance upon the

Government's applications included the unlisted offenses.

■ The government argues that a handwritten change in the Order of authorization dated January 18, 1991, served to properly limit the scope of that order. The order as originally printed authorized intercepts for a list of offenses "described above in paragraph (a) above" of the order, which paragraph included offenses not found in § 2516. A handwritten interlineation struck the reference to paragraph (a) and substituted "in paragraph (b) on pages 3 & 4 hereof." The government contends that this limited the authorization to a curative "operative description" of the conversations to be intercepted. This Court notes, however, that the proposed order, as submitted by the United States, originally contained *two* paragraphs denoted as paragraph "(a)" [one beginning on the first page and the other beginning on page 5]. My recollection of the reason for the interlineation was simply to eliminate confusion on this point alone. However, any reliance upon my recollection or that of the Government lawyer upon this point is misplaced and unnecessary. It is the totality of the effect of the order that is dispositive of this important issue. The Court further notes that Title III requires a "particular description of the type of communication sought to be intercepted, *and* a statement of the particular offense to which it relates." 18 U.S.C. § 2518(4)(c) (emphasis added). The "operative description" cited by the government plainly states that "the communications are expected to constitute admissible evidence of the commission of the offenses *listed above*" (emphasis added). Those offenses "listed above" included the offenses not found in 18 U.S.C. § 2516.

Finally, the government's emphasis on the change only serves to underscore the error. It should be noted that the original proposed order was submitted by the United States and was not a product of this Court's independent research and opinion writing. The statutorily defined procedure in these matters is for the United States to make application to the Court after authorization has been obtained from a specially designated Assistant Attorney General in the United States Justice Department. Typically, such application will be made in the form of a proposed order submitted by the Government. When, as was the case here, time was of the essence and Government officials had made sworn representations to this Court that the predicate statutory requirements had been met, then, under such circumstances, the Court was justified in relying upon the Government's sworn representation. Such reliance at an early stage in the proceedings does not now detract from the importance of strict adherence to the mandates of Congress set forth in Title III. Having so relied upon the Government's representations, the Court is now moreover obliged to accord to the Defendants the most sifting analysis of the earlier proceedings in this case.

■ The Government urges the Court to apply a "good faith" exception to the exclusionary rule, pursuant to *United States v. Leon*, 468 U.S. 897, 923, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984), asserting that there was no bad faith or intentional misconduct on the Government's part in this matter. *Leon* carved out an exception to the Fourth Amendment exclusionary rule in search warrant cases, and the Eleventh Circuit has extended application of this exception to Fourth Amendment challenges to wiretaps. *United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir.1988), *cert. denied*, 489 U.S. 1029, 109 S.Ct. 1163, 103 L.Ed.2d 221 (1989). As a threshold matter, the exclusionary rule of concern here is a statutory one adopted by Congress in Title III and codified at 18 U.S.C. § 2518. *United States v. Donovan*, 429 U.S. 413, 432–33 n. 22, 97 S.Ct. 658, 670–71 n. 22, 50 L.Ed.2d 652 (1977); *Giordano*, 416 U.S. at 524, 94 S.Ct. at 1831. Section 2518 plainly provides for exclusion of "unlawfully intercepted" communications. 18 U.S.C. § 2518(10)(a). While it is true that the legislative history reveals that § 2518(10)(a) " 'largely reflects existing law' and that there was no intention to 'press the scope of the suppression role beyond present search and seizure law,' " *Giordano*, 416 U.S. at 528, 94 S.Ct. at 1832 (quoting S.Rep. No. 1097, 90th Cong., 2d

Sess. (1968) U.S.Code Cong. & Admin.News 1968, 2112), Title III's enactment predated *Leon*'s judicially crafted "good faith" exception. Furthermore, the legislative report stated that "the section provides for suppression of evidence directly or indirectly obtained 'in violation of this chapter' and that the provision 'should serve to guarantee that the standards of the new chapter will sharply curtail the unlawful interception of wire and oral communications.'" *Id.*

In any event, the reasons that justified *Leon*'s "good faith" exception are not present in this case. *Leon* addressed the admissibility of evidence obtained by officers acting in reasonable reliance upon a facially sufficient search warrant approved by a magistrate that, contrary to the magistrate's determination, was ultimately found to be unsupported by probable cause. The Court emphasized that, for the good faith exception to apply, the officer's reliance must be "objectively reasonable," 468 U.S. at 922, 104 S.Ct. at 3420, while further noting that "[i]t is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of [those] ... who provided information material to the probable-cause determination." *Id.* at 923 n. 24, 104 S.Ct. at 3420 n. 24. An exception to the exclusionary rule was justified under the circumstances in *Leon* because, "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient," *id.* at 921, 104 S.Ct. at 3419, and therefore exclusion would not "logically contribute to the deterrence of Fourth Amendment violations." *Id.*

Following *Leon*'s guide, a "good faith" exception analysis in the present case should include consideration of the conduct of those officials who provided information material to the wiretap application, their ability to assess whether the wiretap application complied with Title III, and whether application of the exclusionary rule would logically contribute to deterrence of similar Title III violations. Under Title III, only specific attorneys at the highest levels of the Justice Department may authorize applications for wiretaps and electronic surveillance, 18 U.S.C. § 2516, and these officials are legally trained and should as a matter of routine have familiarity with the provisions of Title III. The United States Attorney was authorized to make the applications. The sworn applications in this case stated that the intercepts would concern offenses "enumerated in Sections 2516(1)(c) of Title 18, United States Code, to wit," followed by a list of offenses that included those that are not enumerated in § 2516.

In *Chavez*, although the Supreme Court held that suppression was not warranted in that case, the Court nevertheless deemed it "appropriate to suggest that strict adherence by the Government to the provisions of Title III would nonetheless be more in keeping with the responsibilities Congress has imposed upon it when authority to engage in wiretapping or electronic surveillance is sought." 416 U.S. at 580, 94 S.Ct. at 1858. Permitting the Government to proceed in this instance without sanction for the overinclusive applications and intercepts offers no incentive for the Government to fulfill its responsibility to comply from the outset with a central and functional provision of Title III. Suppression, on the other hand, would serve the deterrent purpose of the Title III exclusionary rule by placing the initial burden of ensuring compliance with the statute where it belongs: on the Justice Department.

> "In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example.... To declare that in the administration of the criminal law the end justifies the means ... would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face."

*Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).

## B. The Searches

■ The Government has conceded in its objection to the Magistrate's Report that "if the wiretap orders are invalid and the results suppressible, the search evidence [obtained pursuant to the search warrants on January 28, 1991] falls as well," because "the search affidavit is filled with intercepted information and derived investigation." Indeed, *Giordano* held that derivative evidence obtained as the result of an intercept that did not comply with a central provision of Title III must be suppressed. *Giordano*, 416 U.S. at 533, 94 S.Ct. at 1835; *see also Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939). Accordingly, the search evidence obtained pursuant to the warrants issued January 28, 1991 must be suppressed.

## CONCLUSION

For the reasons set forth above, the Court accepts the Magistrate's recommendation that the electronic wire interceptions obtained pursuant to this Court's Orders of December 21, 1990, and January 18, 1991, be suppressed, and that evidence obtained from searches executed pursuant to warrants on January 28, 1991, also be suppressed. Accordingly, these items of evidence are ordered SUPPRESSED in this case, and shall not be admissible as evidence at trial.

Furthermore, the stay of proceedings granted by Order of this Court entered September 10, 1992, is hereby vacated.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

DUNSMORE, United States Magistrate Judge.

## MOTION TO DISMISS THE RICO CONSPIRACY COUNT

Defendants Ward and Nicholson argue that the allegations against them in the Superseding Indictment Count One do not amount to a RICO Conspiracy. A RICO Conspiracy may be demonstrated in one of two ways: by showing (1) that the defendant agreed to participate in a RICO conspiracy or (2) that the defendant was involved in two predicate acts of racketeering which had the relationship and continuity necessary to form a pattern of racketeering activity under 18 U.S.C. § 1962(d). *United States v. Church*, 955 F.2d 688, 694 (11th Cir.1992). In order to show a "pattern" of racketeering activity under 18 U.S.C. § 1962(d), the government must establish that the two predicate acts demonstrate both relationship and continuity. *Id.* at 693. In *H.J., Inc. v. Northwestern Bell Telephone Co.*, the United States Supreme Court defined a "pattern" of racketeering under RICO after examining the legislative history of the statute. "A pattern is not formed by sporadic activity, ... and a person cannot be subjected to the sanctions of Title IX simply for committing two widely separated and isolated criminal offenses. Instead, the term pattern itself requires the showing of a relationship between the predicates and of the threat of continuing activity." *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 238, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989) (citations omitted).

The relationship analysis focuses on how the predicate criminal acts relate to each other. "Criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* 492 U.S. at 239, 109 S.Ct. at 2901 (*citing* 18 U.S.C. § 3575(e)).

The continuity element "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* 492 U.S. at 241, 109 S.Ct. at 2902. Continuity is primarily a temporal concept. The government may show continuity in a closed-ended sense "by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal

conduct." *Id.* 492 U.S. at 242, 109 S.Ct. at 2902. Alternatively, continuity (in the open-ended sense) can be shown by a threat of continued racketeering activity, which is a factual inquiry. *Id.* The threat of continuity may be established by showing that the predicate acts "are part of an ongoing entity's regular way of doing business." *Id.*

### Defendant Nicholson

Defendant Nicholson is charged with the predicate acts of Racketeering Act Four, attempted bribery, and Eleven, evading cash reporting statutes. The alleged bribery attempts took place between 1984 and 1990, while the money laundering occurred between 1990 and 1991. It is unreasonable to conclude that the attempted bribery which consisted of buying barbecue tickets for a few hundred dollars with the intent to influence a state official served the same goals as later structuring of financial transactions so as to avoid the federal reporting requirements. To conclude in such a way would necessitate finding that any and all bribery is related to any later criminal activity. As the Court does not find the relationship element satisfied, it does not need to address the continuity requirement. I FIND AND RECOMMEND that the RICO Conspiracy Count against Chris Nicholson should be DISMISSED; the motion to dismiss Count One as to this defendant should be GRANTED.

### Defendant Ward

Defendant Ward has been charged with the following predicate acts of Racketeering: Act Four, attempted bribery, Eight, prostitution, and Nine, money laundering. For the same reasons stated above, the charge of attempted bribery appears too remote to be related to the charges of prostitution and money laundering. Nevertheless, the relationship element does appear to be satisfied at least with regard to Acts Eight and Nine which both served the end of conducting prostitution and disguising its proceeds. However, the continuity element is not met with regard to defendant Ward. As the United States Supreme Court elaborated in *Northwestern Bell*, continuity can be shown in one of two ways. The closed-ended concept of continuity may be shown where a series of related acts occurred over a long period of time. After finding that the three predicate acts charged are not related, then the closed-ended concept is not satisfied because offenses "extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Northwestern Bell*, 492 U.S. at 242, 109 S.Ct. at 2902. Furthermore, the Court finds that the prostitution and money laundering activity which lasted slightly less than two months, from December 20, 1989 to February 17, 1990, does not threaten continued criminal activity. The activity, moreover, was not a part of a long-term criminal enterprise. There is no evidence which links the illegal prostitution and money laundering to the alleged illegal gambling business so as to transform the prostitution and money laundering into continuous criminal activity. I FIND AND RECOMMEND that defendant Ward's motion to dismiss the RICO Conspiracy Count (Count One) as to this defendant be GRANTED.

## SUFFICIENCY OF INDICTMENT AND MOTION TO DISMISS REGARDING THE ALLEGATIONS OF ATTEMPTED STATE BRIBERY

Defendants Nicholson and Ward both move to dismiss the allegations in Racketeering Act Four (a), (b), and (c).[1] The essential elements of state bribery are set forth at O.C.G.A. § 16–10–2 and are: (1) offer or gift, (2) purpose or intent to corruptly influence, and (3) official status of offeree. *Ingram v. State*, 97 Ga.App. 468, 103 S.E.2d 666 (1958) (decided under former GA.Code 1933, §§ 26–4101, 26–4102). It is not disputed that the targets of the alleged bribery attempts, Mayor Charles DeVaney and Sheriff Charles Webster,

---

1. This discussion is largely academic in view of my earlier recommendation to dismiss Count One as to defendants Nicholson and Ward. It is relevant, however, if the Court decides not to dismiss Count One as to either Nicholson or Ward.

have official state status and thus the actions alleged come within the statute.

The government has charged attempted state bribery. Therefore, they need to show a substantial step towards commission of the crime of bribery plus the requisite criminal intent. O.C.G.A. § 16–4–1; *Howell v. State*, 157 Ga.App. 451, 278 S.E.2d 43 (1981); *Hammond v. State*, 47 Ga.App. 795, 171 S.E. 559 (1933). To be sufficient the indictment must allege acts which are a substantial step toward offering or giving any benefit, reward, or consideration to the named state official to which he was not entitled for the purpose of influencing him in his duties. Further, the indictment is sufficient if it alleges the intent to bribe or gain influence. It does not need to state what influence the defendant sought to obtain. *State v. Lassiter*, 193 Ga.App. 282, 387 S.E.2d 596 (1989).

With regard to the specific charges of attempted state bribery listed in the superseding indictment at pp. 13–15, the Court will address them in the order charged. Racketeering Act Four (a) is facially sufficient in that it alleges the three elements of the offense charged, to wit: giving consideration to which he was not entitled to a state official for the purpose of corruption. While mere campaign contributions without the illegal purpose of corrupting a state official are not bribes, whether such an illegal purpose was present is a factual matter for the jury. *State v. Agan*, 259 Ga. 541, 384 S.E.2d 863, 865 (1989). Therefore, I FIND AND RECOMMEND that the motions to dismiss the allegations of Racketeering Act Four (a) be DENIED.

Racketeering Act Four (b) presents two issues. Initially, an issue arises as to whether raising $2000 from an individual and promising to use that money to bribe the Mayor constitutes a substantial step towards the commission of the crime of bribery. No cases have discussed this specific factual scenario. The reported attempted bribery cases have involved at least an offer of money to a state official or his representative. Under the Georgia statute, such an offer is itself bribery and

not just an attempt. Hence, an attempt may consist of a substantial step towards offering money or other consideration to a state official with the intent to corruptly influence him. However, the Court does not need to resolve exactly what acts may constitute attempted bribery as the Racketeering Act Four (b) charge should be dismissed for lack of evidence. John Gibson testified before the Grand Jury that defendant Ward had not attempted to collect any money from him. Moreover, at Gibson's change of plea hearing on July 15, 1992, to Information No. CR 192–087, Gibson further testified that he gave the $2000 to Jack Mitchell at the Warwick Motel and not to defendants Nicholson or Ward. Accordingly, I FIND AND RECOMMEND that the allegations of Racketeering Act Four (b) should be DISMISSED because they are unsupported by any evidence.

In Racketeering Act Four (c), the government charges that defendants Ward and Nicholson gave money which they had raised from several bookmakers to a campaign representative of Mayor DeVaney for the purpose of corruptly influencing the Mayor. It is not necessary that the defendant offer or give the money directly to the public official to constitute attempted bribery. In *Carpenter v. State*, 167 Ga.App. 634, 307 S.E.2d 19 (1983), the defendant was found guilty of attempted bribery when he offered on behalf of his client to pay the Assistant District Attorney $50,000 to $100,000 in exchange for the Assistant District Attorney's cooperation in the case pending against his client. The defendant was found guilty of attempted bribery even though there were no direct offers between himself and the Assistant District Attorney, instead the defendant communicated his offer to another attorney who was also acting as an undercover agent. *Id.* 167 Ga.App. at 635, 307 S.E.2d 19. Accordingly, the allegations in Racketeering Act Four (c) are not deficient because the alleged bribery did not directly involve a state official.

However, the prosecution has offered no evidence that Nicholson was present at the Marine Room when various individuals allegedly made campaign contributions to

Roy Hooper with the intent to bribe Mayor DeVaney. In light of this total lack of proof against defendant Nicholson, I FIND AND RECOMMEND that the motion to dismiss Racketeering Act Four (c) as to Nicholson should be GRANTED.

Defendant Ward also challenges the allegations in Racketeering Act Four (c) on grounds of insufficient evidence. There is evidence that Ward was present at the time the contribution was made to Mr. Hooper at the Marine Room.[2] While the evidence is extremely thin and may be subject to a directed verdict of acquittal, I am not prepared to dismiss the allegation at this time. Therefore, I FIND AND RECOMMEND that the allegations in Racketeering Act Four (c) survive defendant Ward's challenge; the motion to dismiss should be DENIED.

In conclusion, I FIND AND RECOMMEND that: the motions to dismiss should be DENIED with regard to Racketeering Act Four (a); the motions should be GRANTED with respect to Racketeering Act Four (b); with respect to Racketeering Act Four (c), the motion of defendant Nicholson should be GRANTED and the motion of defendant Ward should be DENIED.

## NICHOLSON'S MOTION TO DISMISS COUNT EIGHT

Defendant Nicholson has moved to dismiss Count Eight which alleges a violation of Racketeering Act Number Eleven (Evasion of Cash Reporting Statutes) on the ground that the Count fails to specify elements of the offense.

In Count Eight, the government alleges that defendants Nicholson and Lester conspired to evade the reporting requirements of 31 U.S.C. § 5313(a) in violation of 31 U.S.C. § 5324(3) and 18 U.S.C. § 2. The government does not allege that Nicholson had a reporting duty nor that he neglected such a duty. The count does allege that Nicholson had the intent to structure a transaction so as to prevent a financial

institution from reporting a transaction of over $10,000. In order to convict the defendant under 31 U.S.C. § 5324(3), the prosecution need only show that the defendant had the intent to avoid the reporting requirements; they do not need to prove that the defendant was aware of the illegality of money structuring. *United States v. Brown*, 954 F.2d 1563, 1568 (11th Cir.1992). Contrary to Nicholson's assertion, the indictment does aver all of the elements of a 31 U.S.C. § 5324(3) violation, to wit (1) the intent (2) to evade the reporting requirements of 31 U.S.C. § 5313(a).

As a preliminary matter, this Court has not been asked to rule on the sufficiency of the evidence against defendant Nicholson, as that is a matter for the trial judge. If the "302's" and other evidence are as weak as counsel for defendant alluded to at oral argument, then he should move at trial under Federal Rules of Criminal Procedure 29(a) for a Judgment of Acquittal. Furthermore, the prosecution may want to review the sufficiency of the evidence against Nicholson. While the indictment alleges a violation, so far the Court has not seen evidence that Nicholson advised his client to structure transactions to avoid the reporting requirements, nor does it appear that the transfer of cash and cashier's checks between the buyer and seller, referred to in the indictment, was in the presence of Nicholson. Clearly, the money did not pass through Nicholson's escrow account.

For the above reasons, I FIND AND RECOMMEND that defendant Nicholson's motion to dismiss Count Eight of the Superseding Indictment be DENIED.

## SWAN'S MOTION TO DISMISS COUNT NINE

Defendant Swan has filed a motion pursuant to Federal Rule of Criminal Procedure 12 to dismiss Count Nine of the superseding indictment for failure to state an offense. Defendant contends as a matter of law that the government cannot show

---

**2.** The government may argue that the owner of a bar is responsible for the actions of his customers, a sort of *respondeat customer* theory.

that he has committed an "act" obstructing justice, an essential element of 18 U.S.C. § 1511. In the alternative, defendant Swan asserts that 18 U.S.C. § 1511 is unconstitutionally vague as applied to him. Specifically, defendant argues that the ordinary and plain meaning of "obstruction" as applied to "committed an act" would not provide notice to an ordinary individual that the forbearance to act might yield criminal liability under § 1511.

As a preliminary note, the Court recognizes the discreet intertwining of defendant's vagueness and "non-action" arguments. Defendant advances the constitutional argument as a result of the government's insistence that § 1511 includes "non-action" or forbearance to act. The government's persistence that the forbearance to prosecute can constitute a violation of 18 U.S.C. § 1511[3] prompts defendant's response that such a reading of § 1511 would be constitutionally void for vagueness. The Court will first review defendant's motion to dismiss for failure to state an offense.

Count Nine of the superseding indictment charges defendant Swan, the sheriff of McDuffie County, with a violation of 18 U.S.C. § 1511, obstruction of State or local law enforcement. Paragraph (a) of that statute states the following:

(a) It shall be unlawful for two or more persons to conspire to obstruct the enforcement of the criminal laws of a State or political subdivision thereof, with the intent to facilitate an illegal gambling business if—

(1) one or more of such persons does any act to effect the object of such a conspiracy;

(2) one or more of such persons is an official or employee, elected, appointed, or otherwise, of such State or political subdivision; and

(3) one or more of such persons conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business.[4]

Thus, to establish a violation of this statute, the government must offer proof that (1) two or more persons conspired to obstruct state or local criminal laws, (2) with the intent to facilitate an illegal gambling business, (3) at least one of the conspirators does any act to effect the object of the conspiracy (to obstruct), (4) at least one of the conspirators was an official or employee of the state or local government, and (5) at least one of the conspirators conducted, managed, supervised, directed, or owned at least part of an illegal gambling business. *See, e.g., United States v. Welch,* 656 F.2d 1039, 1055 (5th Cir.1981), *cert. denied, sub nom. Cashell v. United States,* 456 U.S. 915, 102 S.Ct. 1767, 72 L.Ed.2d 173 (1982).

Counsel for the defendant vehemently argues that the plain language of the statute requires that the government prove that defendant committed an act to effect the conspiracy to obstruct the criminal laws of the state of Georgia with the intent to facilitate an illegal gambling business. Counsel contends that an affirmative act in furtherance of the conspiracy is an essential element to establish culpability under § 1511. Citing *United States v. Cylkouski,* 556 F.2d 799 (6th Cir.1977), the government asserts that the overt act requirement of § 1511 contemplates criminal liability for *any act* performed in furtherance of the conspiracy. Thus, the government need not show an *illegal act* to complete a violation of the statute. In an even bolder reading of § 1511, the government contends that *Cylkouski* stands for the proposition that forbearance to prosecute is sufficient to complete a violation of the statute.

While apprised of the decision of the Sixth Circuit Court of Appeals in *Cylkouski,* the Court must decline to accept the rationale of that decision as non-binding precedent and an improper construction of § 1511. With the exception of that opin-

---

**3.** The government relies heavily on *United States v. Cylkouski,* 556 F.2d 799 (6th Cir.1977), for the premise that an overt, illegal act is not required to constitute a violation of § 1511.

**4.** For the purposes of this discussion, I will assume that the government will be able to establish an illegal gambling business as defined in paragraph (b) of § 1511.

ion, the Court is unaware of any other case authority which states that the forbearance to prosecute satisfies the element of "committed an act" within section 1511. Accordingly, the Court will treat the forbearance issue as one of first impression.

Section 1511 is certainly open to two reasonable interpretations of an *actus reus* requirement. While a literal reading of the statute does not conclusively delineate what overt act, if any, is required to satisfy the parameters of § 1511, one logical interpretation is that Congress intended to establish criminal liability for the forbearance to prosecute a clear violation of state law. While Congress obviously intended to criminalize some type of organized protection [5], another application would be the realistic scenario where a law enforcement officer was cognizant of the illegal gambling business yet turned his head upon discovering the illegality. In rebuttal, one might argue that the statute was so specifically and narrowly drawn that Congress purposely decided not to include any forbearance element in the statute. The statute is most certainly not definitive.

As this judicial officer feels that even more fundamental problems with Count Nine are apparent, the Court declines to decide this issue of first impression. After reviewing the superseding indictment, the pleadings filed by the defendant and the government, and the grand jury testimony of Flavius J. "Cotton" Culpepper, Charles G. Newton, Thomas Gantt, Ralph Starling, and Leonard Reeves, I must conclude that as a matter of law there exists no conspiracy to obstruct the criminal laws of the state of Georgia.

The elements of a conspiracy are an agreement between two or more persons, with an unlawful purpose, and an overt act committed by one of the conspirators in furtherance of the conspiracy. *United States v. Hollifield*, 870 F.2d 574 (11th Cir.1989). At a minimum, the government must prove that two or more persons agreed to commit the crime, that the defendant knew of the conspiratorial goal, and that the defendant voluntarily participated

to help accomplish that goal. *United States v. Jones*, 913 F.2d 1552 (11th Cir. 1990). *See also United States v. Bascaro*, 742 F.2d 1335, *reh'g denied* 749 F.2d 733, *cert. denied, Hobson v. United States*, 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1984) ("knowledge" element of conspiracy refers to knowledge element of conspiracy). Specific intent to join the conspiracy is also a necessary element of proof. *United States v. Prince*, 883 F.2d 953 (11th Cir. 1989). "The essence of conspiracy is the agreement to engage in concerted unlawful activity." *United States v. Suarez*, 608 F.2d 584, 586 (5th Cir.1979). Evidence of agreement is sorely lacking in the government's case for obstruction.

The indictment charges that defendant Swan, "Cotton" Culpepper, and unindicted co-conspirators Ralph Starling, Leonard Reeves, and Thomas Gantt intentionally and knowingly combined, conspired, and agreed to obstruct the enforcement of the criminal laws of the State of Georgia. In support of this charge, the indictment states that Ralph Starling and Thomas Gantt placed numerous bets for defendant Swan with an illegal gambling business. The indictment further alleges that Starling, Gantt, and Reeves delivered defendant Swan's winnings and paid off his losses on numerous occasions. These individuals were defendant Swan's personal friends. Clearly, this activity alone could not support a conspiracy to obstruct state or local criminal laws. While these co-conspirators agreed to aid and abet defendant Swan in gambling, this activity does not amount to an agreement to obstruct the state criminal laws of Georgia.

The government is further unable to demonstrate that "Cotton" Culpepper and defendant Swan agreed to obstruct the criminal laws of the state of Georgia. Defendant Swan always wagered indirectly through the use of a friend. The record contains no evidence that defendant Swan personally wagered with Culpepper or even knew that Culpepper booked his bets. The government has neither alleged in the indictment nor proffered any grand jury tes-

---

5.  *See United States v. Welch*, 656 F.2d 1039 (5th Cir. Unit A 1981).

timony[6] which demonstrates either some direct agreement or even tacit agreement between defendant Swan and Culpepper to obstruct the laws of the state of Georgia.

As noted previously, the essence of a conspiracy is the agreement to engage in concerted unlawful activity. As this element is neither alleged in the indictment nor supported in the grand jury testimony, I must conclude that as a matter of law no conspiracy to obstruct the criminal laws of the state of Georgia exists. Accordingly, I FIND AND RECOMMEND that Count Nine of the superseding indictment be DISMISSED.

As defendant's motion to dismiss for failure to state an offense, has been granted, the Court declines to answer the constitutional challenge that § 1511 is void for vagueness.

## MOTION TO DISMISS COUNT TEN OF THE SUPERSEDING INDICTMENT

Defendant Rufus Millard Smith moves the Court to dismiss Count Ten of the Superseding Indictment against him under Federal Rules of Criminal Procedure Rule 7(c)(1) on the grounds that it fails to be a plain, concise, and definite written statement of the essential facts constituting the offense charged. Defendant contends that the government has failed to establish an element of 18 U.S.C. § 1955 by failing to specifically delineate which Georgia statute defendant allegedly violated further than O.C.G.A. § 16–12–21, et seq.

The relevant portion of the indictment reads:

From on or about January 1, 1976 and continuously thereafter up to and including January 18, 1991, the exact beginning and ending dates being to the Grand Jury unknown, in Richmond County within the Southern District of Georgia, and elsewhere, William E. Baxter, Ben Juan Cheek, Jesse Moore, Richard Oglesby, Leon Ward, Chris Nicholson, Norman Boulus, Robert Dickens, Nickie Marks, Frank Tiller, Rufus Smith, Robert Wallens, Michael Wallace, the defendants herein, and Cotton Culpepper, Bobby Kay, Jack Mitchell, William Odum, John Gibson, Robert Giffen, Eddie Leo Marcum, Jr., Thomas Groover, James Childs and unnamed others, did unlawfully, intentionally, and knowingly conduct, finance, manage, supervise, direct and own all or part of an illegal gambling business involving sports bookmaking in violation of the laws of the State of Georgia, O.C.G.A. § 16–12–21, et seq., in which said business involved five or more persons who conducted, financed, managed, supervised, directed, and owned all or part thereof, and which said gambling business remained in substantially continuous operation for a period in excess of thirty days, and which received gross revenues in excess of $2,000 on one or more single days.

All in violation of 18 U.S.C. §§ 1955 and 2.

Rule 7(c)(1) requires that the indictment be a plain, concise and definite written statement of the essential facts constituting the offense charged. Further, the indictment must state the statute claimed to have been violated. It is well-settled that each count of an indictment "must stand on its own content without dependence for its validity on the allegations of any other count not expressly incorporated." *United States v. Huff*, 512 F.2d 66, 69 (5th Cir. 1975). Count Ten does not incorporate the language of any other Count in the Superseding Indictment.

The case relied upon by defendant, *United States v. Miller*, 774 F.2d 883 (1985), does not serve to invalidate Count Ten. The court in *Miller* held that it was essential to alleging a violation of 18 U.S.C. § 1955 that the indictment list a "particular state statute" alleged to have been violat-

---

**6.** This Court has embarked upon a rather lengthy journey through the sordid details of this case involving gambling, prostitution, racketeering, and bribery. Along the way, this judicial officer has carefully studied the grand jury testimony of co-conspirators Starling, Gantt, Reeves, and Culpepper, as well as grand jury witness Charles Newton. Nowhere in that lengthy material was the slightest hint of even a tacit agreement to obstruct the criminal laws of the state of Georgia.

ed. *Id.* 774 F.2d at 885. In *Miller,* the indictment charged the defendant with operating an illegal gambling operation, in violation of 18 U.S.C. § 1955, but failed to cite any state statute. *Id.* 774 F.2d at 884. Because the violation of a state statute is an essential element of 18 U.S.C. § 1955, the indictment must aver which state statute(s) were violated. However, *Miller* does not require that an indictment be found insufficient if it alleges several state statutes. Here, the Indictment referred to a series of Georgia laws on gambling and sufficiently apprised the defendant of what he was charged. While the drafters of the indictment could have been more precise, "the true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged." *United States v. Debrow,* 346 U.S. 374, 376, 74 S.Ct. 113, 98 L.Ed. 92 (1953). From the face of the Indictment as to Count Ten, it is sufficient. *United States v. Critzer,* 951 F.2d 306 (11th Cir.1992). Therefore, I FIND AND RECOMMEND that defendant Smith's motion to dismiss Count Ten of the Superseding Indictment should be DENIED.

For the foregoing reasons, I FIND AND RECOMMEND that defendant Frank Christopher Tiller's motion to dismiss Count Ten and that of defendant Wallace of the Superseding Indictment should be DENIED.

## MOTION TO DISMISS COUNT TWENTY

Defendants Ward, Nicholson, Tiller, Anderson and Marks seek a dismissal of Count Twenty of the Indictment which seeks the forfeiture of certain, unspecified property. Each of these defendants are named in Count One of the Indictment. In the event of a finding of guilty as to the defendants named in Count One, the United States under Count Twenty would be entitled to seek the forfeiture of properties derived from the proceeds of the criminal enterprise including properties used in the operation and maintenance of the enterprise. In Count Twenty, certain property which the United States seeks to forfeit is specifically listed as to defendants Lester,

Dickens, and Boulus. Defendants Ward, Nicholson, Tiller, Anderson and Marks seek a dismissal from Count Twenty inasmuch as the United States, even though extensive discovery has been provided, has not identified any specific property to which the United States is seeking a forfeiture.

At the motions hearing on August 19, 1992, the United States stated that it had not identified any additional property which would be forfeitable under 18 U.S.C. § 1963 as against defendants Ward, Nicholson, Tiller, Anderson and Marks, and accordingly I FIND AND RECOMMEND that the motion to dismiss as to defendants Ward, Nicholson, Tiller, Anderson and Marks in Count Twenty be GRANTED.

## PRELIMINARY MOTION TO DISMISS BASED ON DOUBLE JEOPARDY

Defendant Lester moved to dismiss the following parts of the Superseding Indictment, Count One, Racketeering Act One, subsections (a), (b), (c), and (d), Count Two, and Count Twenty, based on the principals of Double Jeopardy, *res judicata,* and collateral estoppel. The argument is that certain issues litigated before a Magistrate Judge in a civil forfeiture hearing should be precluded from relitigation in a subsequent criminal case.

The Double Jeopardy Clause of the Fifth Amendment of the United States Constitution provides: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." The constitutional provision protects against "multiple punishments," as well as a second prosecution after conviction or acquittal. *United States v. Halper,* 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989); *United States v. Felix,* 926 F.2d 1522, 1525 (10th Cir.1991). In assessing whether multiple punishments are at issue, the "labels 'criminal' and 'civil' are not of paramount importance" as civil proceedings can advance punitive aims. *Halper,* 490 U.S. at 447, 109 S.Ct. at 1901. An important distinction between this case and *Halper* is that *Halper* considered the pro-

priety of a civil proceeding which followed a criminal trial.

The *Halper* Court considered what made a civil sanction constitute punishment. "The determination whether a given civil sanction constitutes punishment in the relevant sense requires a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve." *Id.* 490 U.S. at 448, 109 S.Ct. at 1901. "*Halper* requires a comparison between the civil penalty and the government's loss resulting from the defendant's conduct." *United States v. Reed*, 937 F.2d 575, 577 (11th Cir.1991). Where a civil sanction serves only a retributive or deterrent purpose rather than a remedial one it may properly be considered punishment. *Halper*, 490 U.S. at 448, 109 S.Ct. at 1902. "This is not to say that whether a sanction constitutes punishment must be determined from the defendant's perspective. On the contrary, our cases have acknowledged that for the defendant even remedial sanctions carry the sting of punishment." *Id.* 490 U.S. at 447 n. 7., 109 S.Ct. at 1901 n. 7. The issue before the Court is whether the civil forfeiture proceeding against defendant Lester's business property served a remedial purpose or merely one of retribution or deterrence.

In this assessment, the Court initially notes that the forfeiture proceeding was directed against Lester's property specifically and not his person. Further, the proceeding was to determine whether the Riverfront Pub and Discotheque Lounge were the site of gambling activity rather than to determine whether Lester was a gambler. Lester's gambling activities outside of the properties in question was irrelevant to the civil forfeiture hearing as this proceeding merely sought to determine whether the property was used for illegal purposes. As the civil forfeiture did not seek to punish defendant Lester for his personal gambling activities, the prior civil proceeding was to serve remedial rather than deterrent aims and, therefore, the Double Jeopardy Clause does not forbid the criminal prosecution of defendant Lester.

The doctrine of *res judicata*, or claim preclusion, is inapplicable to the case at hand. *Res judicata* "treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same 'claim' or 'cause of action.'" *Kaspar Wire Works, Inc. v. Leco Engr'g & Mach., Inc.*, 575 F.2d 530, 535 (5th Cir. 1978). There is no contention that the claims in the current indictment mirror those in the civil forfeiture, so claim preclusion is inapplicable.

The next contention is that the doctrine of collateral estoppel, or issue preclusion, applies to prevent the relitigation of certain factual issues. The Double Jeopardy Clause encompasses the doctrine of collateral estoppel. The doctrine "means simply that when an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970). Moreover, in criminal cases, the rule of collateral estoppel "is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." *Id.* 397 U.S. at 444, 90 S.Ct. at 1194.

The issue litigated in the civil forfeiture proceeding was initially whether a predeprivation hearing was appropriate and secondly whether the property known as 531 and 533½ Broad Street, Augusta, Georgia was subject to forfeiture for involvement in activities in violation of federal gambling statutes. While the Magistrate Judge, in dicta, discussed the conduct of defendant Lester, such a determination was not necessary to the report and recommendation nor was it thoroughly litigated by the parties. Hence, the only factual issue which was litigated and determined and which could possibly have an estoppel effect is whether the property in question was involved in gambling activity.

There are several requirements for collateral estoppel to apply. First, the issue must have been raised and actually litigated in the prior proceeding. Second, the determination must be necessary to a *final*

*judgment* on the merits. Third, the issues in the successive cases must be identical. *Delap v. Dugger*, 890 F.2d 285, 314 (11th Cir.1989); 1B J. Moore, J. Lucas, T. Currier, *Moore's Federal Practice* 0.443[1] at 759 (1988). With respect to the first requirement, as before mentioned, only the use of the property for gambling purposes was litigated and determined.

The second prong is more difficult to assess in this instance. Defendant Lester argues that the Magistrate Judge's order of April 3, 1992 should be considered final for two reasons. First defendant argues that the civil forfeiture hearing was before the Magistrate Judge under 28 U.S.C. § 636(c)(1) whereby both parties expressly consent to the jurisdiction of the Magistrate Court. When such consent has been given, appeal is directly to the Court of Appeals. As the United States government has not appealed to the Court of Appeals, so the argument goes, then the Magistrate Judge's order of April 3, 1992 would be final. However, consent to a civil trial or other proceeding by a Magistrate Judge must "be explicit and cannot be inferred from the conduct of the parties." *Clark v. Poulton*, 914 F.2d 1426, 1431 (10th Cir.1990). *See also Fowler v. Jones*, 899 F.2d 1088, 1092 (11th Cir.1990). The Court does not find that the United States government gave express consent to the Magistrate Court's jurisdiction under 28 U.S.C. § 636(c)(1).

As the Court finds that its authority was based upon 28 U.S.C. § 636(b)(1), it must now consider the defendant's second contention. Defendant Lester argues that the Magistrate Judge's order of April 3, 1992 should be considered final because the government has not ordered a transcript to accompany their appeal to the district court. Federal Rules of Civil Procedure Rule 72(b) offers some support for his contention. "A party objecting to the recommended disposition of the matter *shall* promptly arrange for the transcription of the record ..." unless the district judge otherwise directs." Fed.R.Civ.P. 72(b). While his argument is persuasive, the case law is clear. A Magistrate Judge's order under 28 U.S.C. § 636(b)(1)(B) is not final

and cannot become final merely through lack of objection. *United States v. Mers*, 701 F.2d 1321, 1337 (11th Cir.1983). In conclusion, there can be no collateral estoppel effect to the April 3, 1992 order of the Magistrate Judge because it is not a final judgment. Therefore, I FIND AND RECOMMEND that defendant Lester's motion to dismiss based on Double Jeopardy, *res judicata*, or collateral estoppel be DENIED.

## DEFENDANT BAXTER'S MOTION TO SUPPRESS TITLE III INTERCEPTS

Defendant Baxter alleges that the interception orders of December 26, 1990, and January 22, 1991, are invalid and unlawful on their face because two of the offenses under investigation by federal law enforcement officers for which the warrants were obtained are not allowed under Title III, 18 U.S.C. §§ 2510–20. The issue has been extensively briefed and argued. From those briefs, arguments and evidence in the record, the Court finds that on December 21, 1990, Assistant Attorney General Robert S. Mueller, III, in a letter to United States Attorney Hinton R. Pierce, authorized the United States Attorney for the Southern District of Georgia to make application to this Court for an Order under 18 U.S.C. § 2518, authorizing the interception of wire and oral communications for telephone number (404) 736–3584, subscribed to by Doris B. Culpepper; (404) 855–1267, subscribed to by Jim Childs; and for the card room of the Riverfront Pub and the office of James "Whitey" Lester at the Discotheque Lounge in Augusta, Georgia, in connection with an investigation into possible violations of Title 18, U.S.C. § 371, 1084, 1511, 1951, 1953, 1955, and Title 26, U.S.C. § 7201.

On December 21, 1990, an Order authorizing the interception of wire and oral communications for those telephone numbers, the card room of the Riverfront Pub, and the office of James Whitey Lester at the Discotheque Lounge was signed by a United States District Judge for this Court. The United States, in its application to the

Court for the interception of wire and oral communication, stated that there is probable cause to believe the named individuals set forth in the application

"... have committed and are now committing certain offenses involving, to-wit:
(1) transmission of wagering information (18 U.S.C. § 1084);
(2) illegal gambling business (18 U.S.C. § 1955);
(3) interstate transportation of wagering paraphernalia (18 U.S.C. § 1953);
(4) Hobbs Act—extortion under color of official right (18 U.S.C. § 1951);
(5) obstruction of state or local law enforcement (18 U.S.C. § 1511); .
(6) conspiracy to commit said violations (18 U.S.C. § 371);
(7) income tax evasion (26 U.S.C. § 7201)."

In subparagraph (b) to the Order authorizing interception of wire and oral communications, which recited the above offenses in paragraph (a), the Order states that the Court has found that there is probable cause to believe that particular wire and oral communication of the named individuals "concerning the above offenses will be obtained through the interception of wire and oral communications, authorization for which is GRANTED herein." On page 4 of the Order of authorization of December 21, 1990, in paragraph (b), the following additional language appears: "In addition, the communications are expected to constitute admissible evidence of the commission of the offenses above-described."

On January 18, 1991, Robert S. Mueller, III, Assistant Attorney General, in a letter to Hinton R. Pierce, United States Attorney, Southern District of Georgia, authorized an application before a federal judge of this Court for an Order under 18 U.S.C. § 2518 to intercept the wire communications of telephone numbers (404) 855–7113, subscribed to by William E. Baxter, Jr.; (404) 733–3253, subscribed to by Donald Boyd; (404) 733–1966; and (404) 736–2222, subscribed to by Bennie Cheek; (404) 722–6671, subscribed to by Rubens Department Store; (404) 736–2003, subscribed to by Bonnie Lee Ruben and Paul Ruben; and

(404) 863–7038, subscribed to by Bobby Gene Kay. Here again, the letter of authorization from the Attorney General stated that the application and order were for possible violations of Title 18, United States Code §§ 371, 1084, 1511, 1951, 1952, 1953, 1955 and Title 26 United States Code § 7201 by William E. Baxter and others named therein. The January 18, 1991 affidavit of Gerald L. Jones, Special Agent of the Federal Bureau of Investigation, at page 4, recites that there is probable cause to believe that the individuals named thereafter "have committed and are committing certain offenses involving to-wit: (1) Transmission of Wagering Information (18 U.S.C. § 1084); (2) Illegal Gambling Business (18 U.S.C. § 1955); (3) Interstate Transportation of Wagering Paraphernalia (18 U.S.C. § 1953); (4) Interstate Transportation in Aid of Racketeering (18 U.S.C. § 1952); (5) Hobbs Act—Extortion under color of official right (18 U.S.C. § 1951); (6) Obstruction of state or local law enforcement (18 U.S.C. § 1511); (7) Conspiracy to commit said violations (18 U.S.C. § 371); (8) Income Tax Evasion (26 U.S.C. § 7201); (9) Aiding and Abetting (18 U.S.C. § 2)."

Likewise, the application of January 18, 1991, at page 3 therein repeats the identical offenses for which the wire interception is sought. The Court's Order authorizing the interception of the wire communications pursuant to the application of January 18, 1991, states at paragraph (a) "... there is probable cause to believe that William E. Baxter, ... have committed and are now committing certain offenses involving to-wit: the offenses listed are identical to those set forth in the Attorney General's letter of authorization of January 18, the affidavit of January 18, and application of the United States Attorney." Reference again is made to the above offenses in paragraph (a) on page 3 of the Order of authorization on January 18, 1991. Subparagraph (b) again relates that there is probable cause to believe that wire communications of the named individuals concerning "the above offenses will be obtained through the interception of wire communications, authorization for which is GRANT-

ED HEREIN." On page 4 of the Order of authorization, there is again reference to the fact that, "In addition, the communications are expected to constitute admissible evidence of the commission of the offenses described above." Another reference on page 7 states, "To commit the above offenses."

Title 18, United States Code, § 2516, delineates the specific offenses for which the Attorney General or any Assistant Attorney General specifically designated by the Attorney General may authorize an application to a federal judge of competent jurisdiction for interception of wire or oral communications. The following offenses interceptions are authorized:

(a) any offense punishable by death or by imprisonment for more than one year under sections 2274 through 2277 of title 42 of the United States Code (relating to the enforcement of the Atomic Energy Act of 1954), or under the following chapters of this title: chapter 37 (relating to espionage), chapter 105 (relating to sabotage), chapter 115 (relating to treason), or chapter 102 (relating to riots);

(b) a violation of section 186 or section 501(c) of title 29, United States Code (dealing with restrictions on payments and loans to labor organizations), or any offense which involves murder, kidnapping, robbery, or extortion, and which is punishable under this title;

(c) any offense which is punishable under the following

sections of this title: section 201 (bribery of public officials and witnesses), section 224 (bribery in sporting contests), section 1084 (transmission of wagering information), section 1503 (influencing or injuring an officer, juror, or witness generally), section 1510 (obstruction of criminal investigations), section 1751 (Presidential assassinations, kidnapping, and assault), section 1951 (interference with commerce by threats or violence), section 1952 (interstate and foreign travel or transportation in aid of racketeering enterprises), section 1954 (offer, acceptance, or solicitation to influence operations of employee benefit plan), section 659 (theft from interstate shipment), section 664 (embezzlement from pension and welfare funds), or sections 2314 and 2315 (interstate transportation of stolen property);

(d) any offense involving counterfeiting punishable under section 471, 472, or 473 of this title;

(e) any offense involving bankruptcy fraud or the manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in narcotic drugs, marihuana, or other dangerous drugs, punishable under any law of the United States;

(f) any offense including extortionate credit transactions under sections 892, 893, or 894 of this title; or

(g) any conspiracy to commit any of the foregoing offenses.

I find in this regard that the letter of authorization from the Attorney General on December 21, 1990, and the subsequent letter of authorization on January 18, 1991, specifically authorized Hinton R. Pierce, United States Attorney for the Southern District of Georgia to apply for an order under 18 U.S.C. § 2518 for two offenses for which a Title III intercept is not authorized, specifically violations of 26 U.S.C. § 7201 and 18 U.S.C. § 1953, interstate transportation of wagering paraphernalia. The affidavit in conjunction with the December 21, 1990, Order of authorization, the application and the Order authorizing the interception of wire and oral communications all recite that the applicant is investigating and requesting a wire intercept for a tax violation and interstate transportation of wagering paraphernalia. On both December 21, 1990, and January 18, 1991, a federal judge of this Court found that there was probable cause to believe that the particular wire communications of the individuals whom federal agents sought to intercept would establish evidence that those individuals were, amongst other things, involved in income tax evasion, 26 U.S.C. § 7201, and interstate transportation of wagering paraphernalia, 18 U.S.C. § 1953.

The United States in its "Fourth Combined Response to Pretrial Motions" admits on page 17 "Baxter correctly points out that tax evasion is not a listed offense of which wiretapping is available under 18 U.S.C. § 2516." The United States argues, however, that so long as there is probable cause to support an interception under a section authorized for interceptions under Section 2516 that the warrant is sufficient. Importantly, the agents listened to conversations for matters that they would not otherwise be entitled to eavesdrop; that is not harmless. The United States further argues that a defendant who is aggrieved could suppress on the basis of lack of minimization, or that the Court under 18 U.S.C. § 2517(5) could deny the United States the opportunity to use whatever tax evasion evidence might have resulted from the interceptions to "other offenses." The United States argues that to suppress the wire intercept would be inappropriate, since it was not engaging in any subterfuge as to defendant Baxter. In support of its contention, the United States relies upon the case of *In Re Grand Jury Subpoena Served on Doe*, 889 F.2d 384 (2nd Cir.1989) which found that where the original surveillance order was obtained for permissible purposes, the subsequent use of evidence obtained to prove federal tax offenses could be authorized under Section 2517(5). What the government does not tell the Court is that in *Doe* an amendment was sought to include investigation for tax violations, which the Court granted. The Court of Appeals affirmed on a case of first impression, noting that the original application had been lawfully obtained and the communication on which it was seeking an amendment had been incidentally intercepted. Those are not the facts present *sub judice*. Further, the United States argues that in the Court's Order of January 18, 1991, the correction made on page 6 at paragraph (b) indicates that the district judge was authorizing interception of communications only authorized by Section 2516. I find these arguments to be totally disingenuous and unworthy of any further comment. The applications were void *Ab Initio*.

An electronic search obtained through a Title III intercept is considerably different than a traditional search warrant application. First, the electronic search is a far more intrusive invasion of privacy, and not only invades the privacy of the target of the investigation, but also of other individuals who may contact the individual under investigation. Unlike an individual who is the subject of a conventional search, one who is affected by an electronic search does not immediately know of the intrusion. The electronic intrusion is always secret, and may never be made known to the individual if the investigation is unfruitful. In a traditional search, the subject knows immediately that his premises are being invaded and what possessions are being seized, or shortly thereafter he is aware of the fact if it occurs at a time when he is not present at his residence.

The intrusion of an electronic surveillance is of a longer duration, more extensive into the privacy and affects more individuals. *See United States v. Santora*, 583 F.2d 453, 462–63 n. 6 (9th Cir.1978). In *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court held that wiretapping does constitute a search. In *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), the Supreme Court did not find the Fourth Amendment applicable to wiretapping, and indicated that Congress could prohibit such activity. In 1934, 47 U.S.C. § 605 was enacted which provided in part: "No person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communications to any person." While it appears that Congress in 1934 intended to outlaw wire intercepts, it did not provide any exclusionary rule, and the Supreme Court in *Nardone v. United States*, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937) held that the statute's prohibition against intercepting a divulgence of the contents of messages applied only to federal law enforcement officers. Following a retrial in the *Nardone* case, the Supreme Court held that both

direct and derivative evidence obtained from a wiretapping in violation of Section 605 was not permissible. 308 U.S. 338, 340, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939).

The legislative history of Title III and the authorization for electronic intercepts now embodied in 18 U.S.C. § 2516 reveals that there were numerous legislative attempts to authorize wiretaps. The debate was great. In fact, in congressional hearings, it appears that Congress was made aware of numerous illegal electronic surveillances conducted by private persons and public officials. One proposal before Congress would have entirely banned all types of wiretapping at both the state and federal levels except for national security investigations. The resulting legislation was a compromise and specifically limited wiretapping. It entrusted initial authorization to the Attorney General, and then required Court approval. Even then, 30 days was the maximum period of the intercept, though an extension would be sought. After many years of wrangling in the 1960s, President Lyndon B. Johnson, on June 19, 1968, signed the Omnibus Crime Control and Safe Streets Act of 1968 which included Title III. *Sub judice* from its inception through the carrying out of the Court's Orders of January 18 and December 21, 1990, the United States was permitted to use an electronic intercept to investigate two offenses which are not authorized under Title III. To permit the use of evidence obtained in violation of Title III must be prohibited and cannot be lightly considered.

Because of the extensive intrusion of a wire intercept, I find that the authorization and applications must be strictly construed and may only be obtained for those offenses which are specifically designated in the statute. Given the lengthy congressional history behind Title III intercepts and the specific offenses set forth in Section 2516 limiting interception orders to only certain specific federal crimes, the inclusion in both the Justice Department's authorization, the United States Attorney's applications and this Court orders of interception for two offenses for which a wire

intercept is not authorized must result in the suppression of those wire intercepts. To ensure that there are proper investigative motives, the statute must be strictly construed in favor of the public at large, and against the applicant.

Moreover, I find that in both applications, the affiant promised to minimize the interceptions of communications not otherwise subject to interception and promised to monitor only conversations related to the offenses under investigation. Thus, the agents implementing the authorization orders did not intend to minimize conversations which dealt with interstate transportation of wagering paraphernalia (18 U.S.C. § 1953), and matters concerning income tax evasion (26 U.S.C. § 7201). At the hearing on August 19, 1992, defendant Baxter referenced the lack of minimization regarding his conversations with a stockbroker and the promotion of fights. In addition, defendant Cheek referenced conversations which had no gambling-related information at all which were clearly not minimized, as has defendant Nicholson in his attack on the failure of the United States to sufficiently minimize its interception.[7]

The unauthorized wiretapping to investigate a federal tax offense and the interstate transportation of wagering paraphernalia emanates from the Justice Department. The inclusion of these two offenses appears in both affidavits of the Special Agent of the Federal Bureau of Investigation in the application for the wire intercepts and in the Court's Orders of authorization. It is clear that the Justice Department gave authorization to the United States Attorney for the Southern District of Georgia to seek an application for a wire intercept for not only offenses covered in Section 2516, but two that were specifically prohibited and that this continued through the Court's Orders of authorization entered on December 21, 1990, and January 18, 1991. In each instance, the Justice Department and the United States Attorney and an agent of the Federal Bureau of Investigation led a federal judicial officer to believe that all of the offenses delineated in

7. *See* Defendant Nicholson's Exhibits 2, 3 and 4

admitted following hearings on August 19, 1992.

the affidavits, the applications and the Orders of authorization permitted the Court to authorize such conversations to be overheard.

Given this repeated pattern of misauthorization, and supplying misleading information to the Court, on which the Court relied, the government's actions cannot be condoned, excused or lightly set aside. The very agency designated by Congress to seek and approve authorizations for wire intercepts on two consecutive occasions, misled a judicial officer of this Court into signing orders granting federal law enforcement officers the right to listen into phone conversations. Such invasions of privacy are to be jealously guarded. Title III intercepts are not to be routinely granted, but are limited where traditional means of law enforcement would otherwise fall short. The statute should be strictly construed and narrowly applied. Applications which include criminal offenses for which wire interceptions are not authorized must be sternly addressed, and must, in the opinion of this judicial officer, result in their suppression. The government too blithely seeks to discharge the inclusion of two offenses for which electronic surveillance is not authorized as being minimal. From the inception of this case, the Court has been troubled by the actions of the United States which at times have seemed excessive and high-handed, and which have required the intervention of this Court to balance the rights and privileges of those affected by some rather overbearing tactics. This is yet another aspect which smacks of being in deliberate disregard for the rights of others and the constitutional prohibitions concerning certain types of wiretaps.

In balancing the right of privacy of individuals with the need for law enforcement officers to investigate crimes, this Court cannot permit the United States to do that which the statute clearly and specifically prohibits. While the warrants were issued upon probable cause, these warrants cannot authorize a search for an improper object. *See Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Accordingly, I FIND AND RECOMMEND that the mo-

tions to suppress the electronic wire interceptions under this Court's Orders of December 21, 1990, and January 18, 1991, be GRANTED.

Should this not be accepted, the following discussion addresses the issue of probable cause in the issuance of the wiretap orders of December 21, 1990 and January 18, 1991.

## PROBABLE CAUSE FOR ISSUANCE OF WIRE INTERCEPTS

After a review of the affidavit filed by special agent Gerald Jones of the Federal Bureau of Investigation in support of the first application for an order authorizing the interception of wire communications, the Court finds sufficient probable cause existed to justify the issuance of an order authorizing the first wiretap. As a result of that wiretap, the government acquired ample probable cause to believe that certain illegal gambling activities were occurring. Thus, probable cause existed to justify the issuance of the second order authorizing interception of wire communications.

## NECESSITY

After reviewing the government's affidavit in support of the application for first order authorizing interception of wire and oral communications, I must conclude that the government demonstrated sufficient necessity warranting the order authorizing the wiretap. I concur with the government's contention that normal investigative procedures had not produced sufficient evidence to identify all the participants of the gambling organization. Further, it appears that other normal investigative procedures would probably not be successful in obtaining the necessary evidence. Though I cannot conclude that the other investigative procedures would, as a matter of law, be too dangerous, it is likely that the illegal gambling would cease to continue upon discovery of the investigation. Neither was it necessary for the affidavit to show a comprehensive list of what possible investigative techniques had been exhausted. *United States v. Van Horn*, 789

F.2d 1492, 1497·(11th Cir.1986). Thus, the first order for wiretap was necessary.

The government in its first affidavit for an order for a wiretap demonstrated several reasons why the order was necessary. First, subjects of the investigation would unlikely incriminate themselves in any federal grand jury investigation into the illegal gambling activities. Though the government might seek grand jury immunity for some of the subjects, that procedure would likely foreclose prosecution of many of the other culpable targets. Secondly, although surveillance techniques would confirm meetings between alleged conspirators, it would be virtually impossible to intercept a discussion of any criminal activity. The subjects of the investigation are extremely cautious and alert for law enforcement activity regarding their illegal gambling. Therefore, eavesdropping attempts would very likely be unsuccessful. Evidence of this type of unsuccessful attempt was noted in paragraph 15 of the first affidavit, where on at least two occasions surveillance was detected by the subjects of the investigation.[8]

Admittedly, the government had obtained an order of the Court allowing the government to obtain pen register information from the telephones of various subjects of the investigation. However, these telephone records merely provide circumstantial evidence that the telephone was used to contact certain individuals. The records will not reflect the essence of the conversation or whether any illegal gambling activity or other racketeering acts occurred. Clearly, the pen registers were insufficient to determine the extent of the criminal activity occurring at those locations.

The goal of the investigation was to uncover racketeering as well as gambling activity in Augusta. Although a search warrant could enable officers to seize gambling-related paraphernalia, it is unlikely that much, if any, racketeering evidence could be obtained by the same means. Accordingly, the government was required to obtain a wiretap to intercept oral conversations between the conspirators to determine the extent of racketeering activity in the Augusta area.

In reviewing the affidavit and the circumstances and goals of this criminal investigation as a whole, I must conclude that the government demonstrated the sufficient necessity to warrant an order authorizing the wiretaps. On that basis, the motions to suppress should be DENIED.

However, the defendants further point out that if there was a necessity to obtain the first wiretap, certainly the information received during that wiretap vitiated any need for subsequent wiretaps. I disagree. While the first wiretap did demonstrate evidence of illegal gambling activities, it did not conclusively incriminate all of the targets of the investigation. Further, the first wiretap failed to demonstrate evidence of all of the criminal activities sought to be discovered in the first order. While the first wiretap was successful in providing evidence of gambling, the second wiretap was necessary to determine the extent of that gambling activity, as well as any racketeering activity occurring in Augusta. The first and second applications for wiretaps clearly listed the offenses for which the government was attempting to discover information. Therefore, I find that the application and affidavit for the second order provided specific necessity for an order authorizing a wiretap.

## MOTIONS TO SUPPRESS SEARCHES PURSUANT TO WARRANTS OF JANUARY 28, 1991

Defendants Baxter, Boulus, Oglesby and Cheek seek to suppress evidence obtained from their homes, persons and automobiles as a result of applications for warrants to search these locations on the basis that the warrants lacked probable cause. These warrants were based upon the affidavits in connection with the applications for wiretaps on December 21, 1990 and January 18,

---

**8.** Compare *United States v. Weber*, 808 F.2d 1422 (11th Cir.1987), where law enforcement officials failed to exhaust normal investigative techniques, but the warrant was upheld nevertheless.

1991. As the result of information obtained from those electronic intercepts, the Court issued warrants to search the residences of defendants Baxter and Cheek and the person of defendant Boulus and later his residence. In an earlier portion of this Report and Recommendation, I found that the two authorizations from the United States Department of Justice for a Title III wire intercept, the applications, the underlying affidavits accompanying the applications, and the Court's Order authorizing a wire intercept permitted an intrusion for two offenses for which electronic surveillance may not be obtained. As a result of information received from the December, 1990, and January, 1991, wire intercepts, search warrant applications were made to this Court. As a result of those warrants, the residence of defendant Baxter was searched. During the search of Baxter's residence, business records were seized, analyzed and the grand jury returned an indictment against defendant Baxter in Counts 17 and 18, charging him with income tax violation under 26 U.S.C. § 7201, and possession of a firearm by a convicted felon as a result of firearms found in his house during that search. *See* Counts 13, 17 and 18.

Moreover, I found that during the intercept of the telephone number at the Baxter residence, agents did not minimize calls as they should have, specifically calls between the defendant and his stockbroker, and calls involving the defendant and his promotion of boxing activities. Inasmuch as the intercept orders permitted the agents to listen into conversations concerning the defendant's monetary transactions as they might affect whether Baxter was properly reporting all of his sources of income, the later taking of numerous business records, tax records and other documentation which was specifically presented to the grand jury, and which were analyzed by the Internal Revenue Service, are clearly derivative of an illegal search and seizure.

The exclusionary rule, which is a judicially-created remedy, and which results in the suppression of evidence in the government's case which has been derived from an illegal search or seizure under the Fourth Amendment, first appeared in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The primary objective of the exclusionary rule was to deter unlawful police conduct and to assure citizens of their Fourth Amendment right to be free from unreasonable invasions of personal privacy. In *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Court announced a departure from the drastic application of the exclusionary rule by applying a "reasonable or good faith" exception to the exclusionary rule in search warrant cases. For reasons hereinafter set forth, a good faith exception is not applicable.

When a defendant is able to show that evidence was obtained through an illegal search or seizure, the exclusionary rule generally requires that such evidence be suppressed, that is, excluded from being used at trial to prove the case against the defendant. The exclusionary rule applies not only to items obtained in any illegal search or seizure, but to any derivative evidence which is discovered based upon the knowledge gained by the police by the illegal police conduct. *Silverthorne Lumber Company v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

In this case, the primary evidence as to defendant Baxter would consist of the monitored phone calls concerning gambling and tax or revenue matters. The monitored phone calls served as the probable cause to justify the search of Baxter's residence, which in turn produced the derivative evidence which has resulted in the United States charging him in Counts 17 and 18 with income tax evasion, and Count 13 with possession of a firearm by a convicted felon. The Supreme Court in *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), held that where information was gained by an illegal wiretap, that the United States not only was prohibited from using evidence directly obtained, but also the government was required to show that the evidence had not indirectly been obtained from the wiretap. To hold otherwise would mean the United States

would be able to do indirectly what it could not do directly.

Accordingly, so long as the United States can show that the evidence was obtained from an independent source and sufficiently attenuated from the initial illegality, derivative evidence is admissible. In this connection, however, the searches of all persons and places was directly attributable to the illegal Title III intercept. Finding that the searches of January 27, 1991, were issued on the basis of knowledge obtained from an illegal wire intercept, the motions to suppress of defendants Baxter, Cheek, Boulus and Oglesby are GRANTED.

In so making this finding and recommendation, I reject the application of the good faith exception in *United States v. Leon, supra*. It must be noted that from its onset, the very agency charged by Congress with seeing to it that applications for wire intercepts were carefully scrutinized and limited to those offenses which Congress deemed should be the limited subject of such an intrusive invasion, the Attorney General of the United States, on two occasions, included reference that a wire intercept was authorized for income tax evasion and interstate transportation of wagering information. Further, the local United States Attorney did not catch this oversight. Ultimately, this misled the district judge into granting the wiretaps. These facts do not warrant a finding of good faith be applied. The prosecution of this case by the United States has been occasioned with numerous instances of troubling conduct by federal law enforcement officials. This is just another in that chain of events.

Other than the fatal authorization, the underlying affidavit contained probable cause for those offenses for which a wire intercept was authorized.

Should the above recommendation not be adopted, the following discussion ensues:

Defendant Norman Boulus has moved this Court to suppress evidence derived from the search of his person, car, and house. Boulus argued that there was insufficient probable cause to establish that he was engaged in any illegal activity and no evidence to establish that there was any evidence of crime in his car or on his person. The evidence as presented to the Magistrate Judge in the affidavit for a search warrant is undisputed:

(1) Defendant Boulus had a "history of bookmaking violations from 1980."

(2) Several co-defendants' names were included in Boulus' gambling records seized in 1980.

(3) Boulus met with Odom and Phillips at the restaurant in the Landmark hotel while those individuals were "settling-up" with various gambling customers. Later that day Defendant settled-up with "Cotton" Culpepper at the Riverfront Pub.

(4) On January 20, 1991, the government intercepted a gambling-related phone conversation between John Sheehan and Ben Cheek. During this conversation, these individuals mentioned "Norman" and hypothesized about his current luck in gambling activities.

(5) On January 22, 1991, Boulus was seen in the company of other co-defendants at the Riverfront Pub discussing unknown matters.

Defendant Boulus was seized and searched shortly after leaving his home on January 28, 1991. As this was the day after the Superbowl championship football game, this date has independent significance. Naturally, an individual involved in the business of gambling would settle his bets on the day following the Superbowl. I conclude that the government presented sufficient evidence by way of affidavit to satisfy the probable cause requirement for searching defendant Boulus' person and automobile. When read in a common sense fashion, one might reasonably conclude that defendant Boulus' was involved in the business of gambling. At the time of the seizure, defendant possessed various gambling records reflecting win and loss amounts, handicapping information, and other line information. As defendant had just previously left his residence, the government had probable cause to seek a search warrant for defendant Boulus' residence. Under these circumstances, I find that probable cause justified the issuance

of the second search warrant for the search of defendant Boulus' residence. Therefore, I FIND AND RECOMMEND that the motion to suppress the fruits of these searches be DENIED.

Defendant Baxter seeks to suppress the January 28, 1991 warrant at his Flowing Wells residence for both a lack of probable cause, and that the warrant authorized a general exploratory search. Under a totality of the circumstances of *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), probable cause was stated. I refuse to accept the general or exploratory search argument, for while many personal records were taken, including old tax records which should not have been seized, tax and gambling cases by their very nature are paper chases. Hence, greater leniency must be accorded to the searching officers. *United States v. Wuagneux*, 683 F.2d 1343; (11th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983). Defendant Baxter's motion to suppress the search of his residence should be DENIED.

Likewise, the affidavit of January 27, 1991, articulated sufficient probable cause for Independent Underwriters, and thus Oglesby's motion to suppress should be DENIED, as must defendant Cheeks'.

### DEFENDANT SMITH'S MOTION TO DISMISS FOR FAILURE OF THE UNITED STATES TO COMPLY WITH THE COURT'S ORDERS OF AUGUST 10, 1992, AUGUST 20, 1992 AND AUGUST 21, 1992

On August 10, 1992, the Court granted several of the defendants' requests for a bill of particulars, or in the alternative permitted the United States to divulge grand jury transcripts not later than August 21, 1992. The United States at that time indicated that it was going to exercise its option to provide the grand jury transcripts and that it might need some additional time. Shortly thereafter, matters brought to the Court's attention concerning some inappropriate disclosures of information necessitated in a delay in release of the grand jury materials being sent to defense counsel. In addition, a mechanical breakdown with the printer preparing the grand jury transcripts caused a further delay. Defense attorneys have received the grand jury materials, and the fact that the grand jury transcripts were not produced on August 21, 1992, is not a basis upon which defendant Smith is entitled to a dismissal of the Indictment. Therefore, I FIND AND RECOMMEND that the motion be DENIED.

### DEFENDANT SMITH'S MOTION TO DISMISS ON THE BASIS OF THE SELECTIVE PROSECUTION

Defendant Rufus Smith seeks a dismissal of Count Ten, the only charge in which he is named in this indictment, on the basis of selective prosecution. Defendant Smith alleges this on the basis of a "reason to believe" that the government is aware of others who might be in violation, but have not been prosecuted. The fact that prosecutorial discretion is given to the United States does not mean that others who could have been targeted for prosecution have not been requires an indictment's dismissal. Defendant Smith has completely failed to show that the United States did not exercise good faith in the exercise of its prosecutorial discretion, or that the charge against the defendant was brought in bad faith, or based on some invidiously discriminatory purpose. In the absence of anything to suggest selective prosecution, I FIND AND RECOMMEND that the motion to dismiss be DENIED.

### DEFENDANT CHEEK'S MOTION TO DISMISS FOR PROSECUTORIAL MISCONDUCT

Defendants Baxter and Cheek seek to dismiss the Indictment and the charges named against them therein on the basis of improper conduct before the grand jury and prior thereto. First, I find no evidence of any prosecutorial misconduct. Defendant Cheek in his argument to the Court on August 20, 1992, noted that the case has been punctuated with lengthy delays, seizures of considerable amounts of property, delays in bringing the required forfeiture procedures, and an attempt by the United

States to seize certain real property under the civil forfeiture statutes as to defendant Lester which resulted in a dismissal of the complaint. The Court needs no reminder that the path to this Indictment is punctuated with puzzling judgment calls by the United States, which have on two occasions resulted in action by this Court to correct what can only be viewed as excesses in the seizure of property taken following January 26, 1991.

However, this judicial officer has reviewed some 3,500 pages of grand jury testimony, and does not find any indication of any improprieties before that grand jury. Some of the witnesses in this case may be of questionable character (or could be considered ne'er-do-wells) which may not forbode well for their credibility at trial, but placing them before a grand jury does not amount to prosecutorial misconduct. The Court has been troubled about some possible character assassinations and the unfortunate disclosure of certain material which has no probative value, for either the prosecution of the defense. While unfortunate and troubling, this does not constitute prosecutorial misconduct. There have been no matters presented to the Court concerning evidence presented to the grand jury which has prejudiced any of the defendants. For the dismissal of an indictment for prosecutorial misconduct, there must be demonstrated unfair or actual prejudice. *United States v. Ricks*, 817 F.2d 692, 695 (11th Cir.1987).

It is well settled that a district court may exercise its discretionary power to dismiss an indictment on grounds of prosecutorial misconduct where a sufficient showing of prejudice has been made. *United States v. Accetturo*, 858 F.2d 679, 681 (11th Cir. 1988); *United States v. Holloway*, 778 F.2d 653, 655 (11th Cir.1985). This circuit has often reiterated that "prejudice to the defendant is an essential element when a criminal defendant seeks dismissal of an indictment due to prosecutorial misconduct." *United States v. O'Keeke*, 825 F.2d 314 (11th Cir.1987); *United States v. Garate–Vergara*, 942 F.2d 1543 (11th Cir. 1991).

While the Eleventh Circuit recognizes that dismissal may be appropriate under certain prejudicial circumstances, this Court also embraces the proposition that "dismissal of an indictment for prosecutorial misconduct is an extreme sanction which should be infrequently utilized." *Accetturo*, 858 F.2d at 681 (quoting *United States v. Pabian*, 704 F.2d 1533, 1536 (11th Cir. 1983)).

Accordingly, I FIND AND RECOMMEND that the motions to dismiss for prosecutorial misconduct be DENIED.

## CONCLUSION

The following is a summary of the recommendations given in this report and recommendation.

### COUNT ONE

I FIND AND RECOMMEND that defendant Nicholson's motion to dismiss the RICO Conspiracy Count (Count One) against him be GRANTED. I FIND AND RECOMMEND that defendant Ward's motion to dismiss the RICO Conspiracy Count (Count One) against him be GRANTED.

### RACKETEERING ACT FOUR

In conclusion, if the RICO conspiracy charge against defendants Nicholson and Ward is not dismissed, I FIND AND RECOMMEND that: the motions to dismiss should be DENIED with regard to Racketeering Act Four (a); the motions should be GRANTED with respect to Racketeering Act Four (b); with respect to Racketeering Act Four (c), the motion of defendant Nicholson should be GRANTED and the motion of defendant Ward should be DENIED.

### COUNT EIGHT

I FIND AND RECOMMEND that defendant Nicholson's motion to dismiss Count Eight be DENIED.

### COUNT NINE

I FIND AND RECOMMEND that defendant Swann's motion to dismiss Count Nine be GRANTED.

## COUNT TEN

I FIND AND RECOMMEND that defendant Smith's motion to dismiss Count Ten be DENIED.

## COUNT TWENTY

I FIND AND RECOMMEND that the motion to dismiss as to defendants Ward, Nicholson, Tiller, Anderson and Marks in Count Twenty be GRANTED.

## DOUBLE JEOPARDY/COLLATERAL ESTOPPEL

I FIND AND RECOMMEND that defendant Lester's motion to dismiss based on Double Jeopardy, *res judicata,* or collateral estoppel be DENIED.

## MOTIONS TO SUPPRESS

I FIND AND RECOMMEND that defendant Baxter's motion to suppress the electronic intercepts (wiretaps) on the basis that unauthorized violations of federal law for which the electronic surveillance in this case were authorized be GRANTED. In the event the Court does not concur, I find that the application for the wire intercepts were founded upon probable cause, and that the motions to suppress for lack of probable cause and necessity be DENIED.

I FIND AND RECOMMEND that the motion to suppress the searches of January 28, 1991, as being fruit of an illegal wire intercept be GRANTED. In the event the Court does not concur, I find that the application for seizure warrants is founded upon probable cause, and that the motions to suppress the fruits of the searches of January 28, 1991 be DENIED.

## MISCELLANEOUS MOTIONS

I FIND AND RECOMMEND that defendant Smith's motion to dismiss for failure of the United States to comply with the Court's Order of August 10, 1992, August 20, 1992 and August 21, 1992 be DENIED.

I FIND AND RECOMMEND that defendant Smith's motion to dismiss on the basis of selective prosecution be DENIED.

I FIND AND RECOMMEND that defendants Cheek's and Baxter's motions to dismiss for prosecutorial misconduct be DENIED.

SO REPORTED AND RECOMMENDED at Augusta, Georgia this 8th day of September, 1992.